**298 P.2d 804**
**In re John A. METHEANY, a Member of the State Bar of Arizona.**
**No. 6163.**

Supreme Court of Arizona.
June 19, 1956.

Harold L. Jerman, Phoenix, for the State Bar of Arizona.

Scoville & Linton, Phoenix, for respondent.

UDALL, Justice.

Formal charges were filed against respondent, John A. Metheany, a member of the State Bar of Arizona, to the effect that he had advised a client, one Arthur Neckameyer—who was then in serious financial difficulties and contemplating bankruptcy—to leave town and turn certain personal property over to him for the purpose of defeating, delaying and hindering creditors; and that later when other counsel was procured and the idea of bankruptcy abandoned respondent refused to return possession of said property to the complaining witness Neckameyer.

After a full hearing the local administrative committee found respondent had violated the following Canons of Professional Ethics entitled: No. 11, "Dealing With Trust Property"; No. 29, "Upholding

the Honor of the Profession", and No. 32, "The Lawyer's Duty in Its Last Analysis", and it recommended respondent "be suspended from the practice of law for a period of six months". The complete record was then certified to the Board of Governors, before whom respondent and his counsel were given another opportunity to be heard. At the conclusion of this hearing the Board approved the findings of the local administrative committee but disagreed with their recommendation as to a fitting penalty to be meted out by this court. Its recommendation was that "respondent be reprimanded". Briefs were filed in this court, and the matter was orally argued and submitted for decision.

All of the matters complained of occurred within a short period of two weeks (July 16 to July 30, 1953). It seems that Neckameyer, a stranger, came into respondent's office primarily to have a homestead declaration prepared, as he was then in financial difficulties with his TV and electrical appliance business operations both at Avondale (which was a partnership) and at his separate place of business in Phoenix. Furthermore, he was worried over checks he had issued for which there were insufficient funds on deposit in the bank. There is a sharp disagreement between the parties as to just what was said and done and the reasons for it. However it does appear respondent advised the complaining witness that bankruptcy was the best way out of his difficulties and a schedule in bankruptcy was later prepared by respondent and signed by both Mr. and Mrs. Neckameyer, though ultimately it was not filed with the clerk of the U. S. District Court. It is admitted that Neckameyer delivered to respondent's law office an Olympic television set and a small radio, taken from the Avondale store, of the approximate value of $225; and later respondent took from the Neckameyer home a Norge Home Freezer of the value of $300, in addition to which respondent was paid the sum of $103.50 in cash—the proceeds of an old Dodge truck Neckameyer had sold at respondent's suggestion. When other counsel took over, respondent submitted an itemized statement claiming there was due him the sum of $620 for attorney's fees computed upon the basis of 27 hours of work at the rate of $20 per hour plus $80 for preparation of bankruptcy schedule. Credit was given thereon for the electrical appliances listed above, which he claimed had been given to him as payment on such fees. Neckameyer emphatically denied he had turned such appliances over to respondent to apply on attorney's fee. Furthermore there is testimony that he considered the total charge outrageous, computed upon an erroneous basis, and far in excess of the sums agreed upon between the parties for the handling of specific matters. An effort to settle their difficulties as to the amount of the charge—not the ethics involved—having failed, Neckameyer made a formal written complaint to the State Bar of Arizona, and the proceedings indicated above followed in due course. Incidentally the TV set and home freezer were re-

.turned to Neckameyer by respondent just prior to the hearing before the Board of Governors.

■ In view of the disposition we feel constrained to make of this matter, no good purpose would be served in reciting in detail the conflicting versions of the whole affair which were given by the respective parties. Suffice it to say there was a sharp conflict in the evidence, hence as we recently stated in the case of In re Stone, 80 Ariz. 216, 295 P.2d 839, the findings of the local administrative committee, under such circumstances, should be sustained if they are inherently reasonable. This we find them to be by clear and convincing evidence.

■ Accepting the findings of the Committee as approved by the Board, certainly respondent's conduct in this affair is subject to censure and contrary to the ethical standards of the profession. However, from the record it appears that respondent had not been long in the practice and had opened an office of his own only a short time before this incident. We have decided to follow the recommendation of the Board of Governors rather than that of the Local Administrative Committee, with a warning to respondent that any repetition of conduct unbecoming a member of his profession will result in the imposition of a more severe penalty.

It is our opinion that justice requires that respondent, John A. Metheany, be reprimanded for his unethical conduct, and it is so ordered.

LA PRADE, C. J., and UDALL, PHELPS and WINDES, JJ., concur.

STRUCKMEYER, Justice (dissenting).

I regret that I am unable to concur with the other members of the court in a matter of this kind, but I do not think the evidence is sufficient to sustain the charges. The Local Administrative Committee of District No. 4 preferred two charges against the respondent, John A. Metheany: The first, with the violation of Canon No. 11 of the Canons of Professional Ethics in that respondent:

"who was then and there representing one Mr. Arthur Neckameyer, as attorney, advised and requested that the said Neckameyer turn over and place in trust with John A. Metheany certain personal property consisting of one Olympic 20″ Leatherette TV set, one Admiral Table Model radio, and a Norge 15½ cu. ft. freezer for the express purpose of preventing these articles from falling into the hands of Mr. Neckameyer's creditors.

"That, thereafter, when Mr. Neckameyer requested the return of these articles, the said John A. Metheany refused to return the same * * *";

and, the second, with the violation of Canons 29 and 32:

"in that John A. Metheany advised his client, Mr. Neckameyer, to leave town and turn over certain personal property described in paragraph 1 with the intent

to, and for the purpose of defeating, delaying and hindering creditors of Mr. Neckameyer,".

These two charges basically present one question, namely, whether respondent advised and accepted the property described in the first charge in trust with the intention of or for the purpose of defeating, delaying and hindering creditors. The Local Administrative Committee made the following nonspecific finding of fact:

"It is the unanimous concensus of opinion of the Committee that the charges were proved by a preponderance of the evidence at the hearing held on May 8, 1954."

Presumably, the Committee found that respondent took the property in trust for the purpose of defeating, delaying and hindering the creditors of Neckameyer.

Complainant Neckameyer's business consisted of a Television Repair Shop in Phoenix which he personally operated and a partnership interest in a Television Sales and Service Shop in Avondale which was operated by his partner. At the time of the employment of respondent as attorney Neckameyer was in a precarious financial condition being without cash or assets of substantial nature and having outstanding numerous bad checks on which the respective holders were pressing payment and even threatening criminal action. Respondent's position is that, because Neckameyer was without any other means, the articles in question

were delivered to him as payment on attorney's fees. Respondent testified:

"* * * On that same third visit he came back with this T-V set and said if that was satisfactory he would give it to me as a fee for the work on the corporation and the partnership dispute.

"I went out and looked at it and said I didn't know what it was worth but it would be all right to apply on the fee.

"He said it was clear. He also brought in a radio at that same time and said he would apply that as that was his already. (The radio was worth about $20.00)

"I had the T-V set appraised the same day by a man in the business and we established a value of $185 retail, he said it probably was purchased for $135 wholesale. * * *"

"At that time when we started to talk about definitely going into bankruptcy I stated it would be necessary to have the cash for the filing fee and in addition I would have to have sufficient fees to cover bankruptcy. He again said he didn't have any money. * * *"

"* * * * * *

"I then suggested, or it was my suggestion that he turn over his deep freeze to me for the fee, that I didn't have one and inasmuch as he had no cash I would accept that. I knew about it because of the bankruptcy schedules and the amount he had told me.

"He stated at that time the value was

about $300 and I said I would take that. That is the only time any amount was discussed as to the bankruptcy although he had stated the desert land was in excess of three or four hundred dollars and he said the deep freeze was $300.

- "I said I would accept that."

Before proceeding further it is important to stress the legal rights of an attorney when dealing with a supposedly insolvent client, particularly as to whether in contemplation of bankruptcy an attorney has the right to accept property in lieu of cash. In this the law is well settled and clear. Section 60, sub. d of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. d, provides:

"(d) If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by or against him, pay money or transfer property to an attorney and counselor at law, solicitor in equity, or proctor in admiralty for services to be rendered, the transaction shall be reexamined by the court on petition of the trustee or any creditor and shall be held valid only to the extent of a reasonable amount to be determined by the court, and the excess may be recovered by the trustee for the benefit of the estate."

In construing this section and other sections of the Bankruptcy Act the Supreme Court of the United States held that the payment or transfer of property to an attorney prior to petition for bankruptcy and in payment of attorney's fees is neither a fraudulent transfer as to creditors nor a preference voidable by other creditors and is valid to the extent that it is reasonable. In re Wood, 210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046. Respondent was entitled to a reasonable fee for any services performed when bankruptcy was in contemplation. In re Buchanan, 2 Cir., 66 F.2d 416. Nor does such a preference violate any law of the State of Arizona. Under the Arizona Fraudulent Conveyance Act, Chapter 58, Article 4, A.C.A.1939 [A.R.S. § 44–1001 et seq.], a conveyance of property is not fraudulent as to creditors *unless it is made without a fair consideration.*

The policy of the law is clear. An attorney is not required to represent an insolvent debtor without pay. He has a right, if he so desires, to accept property in payment of his fee even if the property could be used to satisfy the debts of other creditors. Certainly, what an attorney has a right to do, even if it conflicts with the financial interests of other persons, cannot be said to violate that other person's rights irrespective of the intent or purpose with which it is done. Here since respondent had a right to take this property in satisfaction of his own debt even if his purpose was to prefer himself, it cannot be said that the legal rights of other creditors are defeated, delayed or hindered thereby.

The majority of this court state that the evidence is clear and convincing. This statement requires an inspection of the evidence. Three witnesses appeared to sustain the charges—complainant, his wife, and his subsequent attorney, Mr. John Levy.

The witness, Mrs. Bernice Neckameyer, wife of complainant, testified in substance that she went to respondent's office twice for the purpose of signing papers, but did not participate in the general discussions and was unable to corroborate her husband on the reason for the transfer of the articles in question. The witness, John Levy, since he appeared in the case only after the respondent was discharged by Neckameyer, was not personally acquainted with any of the relevant facts. By contrast there appeared and testified on behalf of the respondent Mr. Z. Simpson Cox, Mr. L. J. Cox, his partner, both reputable attorneys well known to the members of this court. Mr. L. J. Cox did not actually testify because it was acknowledged before the committee that his testimony would be the same as Mr. Z. Simpson Cox and therefore cumulative. There also appeared a Mrs. Hedy Warder. Mrs. Warder had been respondent's secretary but was not so employed at the time of the hearing. She corroborated respondent on most, if not all, of the material matters in conflict and further produced records made at the time in her handwriting which substantiate respondent. The majority of this court have accepted the uncorroborated testimony of a dissatisfied client over that of a member of this Bar and three substantial, credible and unimpeached witnesses. On such a showing alone this court should order the charges dismissed. The evidence does not preponderate in favor of the charges. On the contrary, the clear preponderance is against the truth of the charges and in favor of the truth of respondent's testimony. Under these circumstances it is impossible for me to believe or say, as the majority have said, that the evidence is "clear and convincing" so as to conform to the rule announced by the court in In re Myrland, 45 Ariz. 484, 45 P.2d 953.

Not only has the majority of the court chosen to accept the uncorroborated word of the complainant Neckameyer as against the corroborated testimony of the respondent, but it has accepted testimony which is inherently unreasonable under the rule recently pronounced in In re Stone, 80 Ariz. 216, 295 P.2d 839. On the 31st day of July, 1953, Neckameyer discharged respondent as his attorney and either then or on the following day received a statement of services rendered. This statement showed the hours and rate per hour with appropriate credits for the articles received. By letter of August 3rd demand was made upon respondent in behalf of Neckameyer by Mr. John Levy, his subsequent attorney, that respondent return the articles in question. No offer was then or at any time since made to pay respondent the reasonable value of his services if the articles were returned. Mr. Cox testified:

"It seems as I recall it, Mr. Levy—I called them both John and I got myself confused several times during the conference—there were two things that were considered unethical by Mr. Levy. One was the amount of the fee and the other was the thought there had been taken property for a fee, a freezer, tele-

vision set and a radio, and that you could not list on a bankruptcy schedule property instead of cash, you had to take cash for attorney fees.

"*   *   *   *   *   *

"There was no discussion about this property belonging to Neckameyer at all. It was stated that the deep freeze, the television and radio, I believe, came first and then the deep freeze later. They went into detail then. Metheany had time cards with him showing his secretary's time cards, the time that had been expended.

"*   *   *   *   *   *

"The only question I remember asking Neckameyer was that Metheany was asking him whether or not John Levy had not called him, whether or not Neckameyer was not satisfied up to that time—there was a question of a lien brought up when Levy was in there concerning that there was a lien on this deep freeze. I can't recall whether Neckameyer was asked concerning that lien or not but that was mentioned at that time *but nothing was mentioned concerning Metheany holding any material in trust. It was a question that he was taking it as a fee at the time* I was called in. * * *."

Later on recross-examination Mr. Cox again testified:

"Q. Did you testify that you didn't think there was anything wrong in regard to the transaction between Mr. Neckameyer and Mr. Metheany regarding the fraudulent acts as far as creditors were concerned?

"A. I testified I did not think it was wrong to take property for a fee which is what John Levy said was defrauding creditors, he thought it was defrauding creditors if you took property instead of money for a fee."

And again:

"Q. That matter was adjudicated between the lawyers?

"A. With Mr. Neckameyer brought in too at the last. The whole thing was, as I understood it, *that the property was transferred for a fee but the fee was too high for the hour charge and that you could not take property for a fee. * * *"

Mr. L. J. Cox was also present during the arbitration discussions and admittedly would have testified to the same effect.

It is therefore established from impartial and credible witnesses that the original controversy was over a question of fees and no claim was initially asserted that the property had not been delivered and accepted by respondent as a fee or that it was property held in trust. It was not until Neckameyer declined to accept the compromise decision of the arbitrator that any assertion was made from which could be inferred that the transfer of the property was for a trust purpose. This is not the normal conduct of an honest man. Either the property belonged to respondent or it belonged to Neckameyer, and if it belonged to Neckameyer and that was the basis for his attempt to

get the property returned, why should he have not said so at the beginning. Such a material change deprives complainant's testimony of any credibility and is alone sufficient to render the subsequent story improbable and unreasonable.

The charges which Neckameyer thereafter made by letter to the State Bar Association and his testimony at the hearing are so replete with inconsistencies that no credence can or should be given thereto. Even a partial recital of the many inconsistencies would extend this opinion beyond reason. Illustrative is the evidence concerning the deep freeze.

First, Neckameyer stated in his letter of complaint to the State Bar Association on August 20, 1953 that the property was turned over to respondent as a fee.

"and at that time Mr. Metheany insisted that he wanted $300.00 or $400.00 more as attorney's fees. I told him that I could not raise any more money and at that time he told me to give him the Norge 15½ ft. cubic freezer which I had in my home of the approximate value of $409.00. * * * I finally consented * * *."

Second, he stated on direct examination nearly nine months later that the freezer was to be held as collateral.

"Q. * * * Will you tell the Committee the circumstances surrounding the delivery of that freezer?

"A. That is when Mr. Metheany asked me for more money and I told him I didn't have any more money. He knew we had a freezer because we told him that in the beginning. We asked him if we went into bankruptcy if they could take the freezer and he said to me, 'You have a freezer? Suppose I take the freezer and hold it as collateral?' * * *"

And later on cross-examination:

"Q. Directing your attention to your testimony about taking the freezer, did I understand you to say he was to hold it as collateral?

"A. He was supposed to hold it *and if I couldn't pay him in money he would sell it.*"

Third, and finally the ultimate absurdity. After extended direct and cross examination and on redirect examination, in answer to a leading question, Neckameyer seems to be suggesting that the proceeds of the sale were to be his.

"Q. Did you or did you not have a conversation and during one of these conversations Mr. Metheany told you to deliver these articles into your (his?) possession to keep them from c(f)alling into the hands of creditors?

"A. That is the idea, he told me that. That was the idea of the television set and freezer *and would give me the extra money* and the creditors wouldn't be after me.

"Examiner: That is all."

No attempt was made at the hearing to explain the obvious incompatibilities inherent in this testimony or reconcile the many

other discrepancies which appear throughout.

As pointed out, Neckameyer originally charged:

"and at that time Mr. Metheany insisted that he wanted $300.00 or $400.00 more as attorney's fees. I told him that I could not raise any more money and at that time he told me to give him the Norge 15½ ft. cubic freezer which I had in my home of the approximate value of $409.00. * * * I finally consented * * *."

This statement completely exonerates respondent. Why, simply because complainant himself says that the freezer was given as attorney's fees. A further critical analysis of the statement not only exonerates respondent on the freezer transaction but on the television and radio as well. It is conceded that respondent did not receive any money from Neckameyer except the cost of filing the bankruptcy petition. At the time respondent insisted upon "$300.00 or $400.-00 *more as attorney's fees*" he had already received the television and radio worth approximately $200. If Neckameyer did not give the television and radio sets as payment on attorney's fees why did he complain in his initial charge that respondent was insisting upon $300 or $400 more as attorney's fees.

I cannot concur in the disposition of a matter in which the testimony does not support the charges made. Nor would I concur where uncorroborated and inconsistent evidence is opposed to corroborated testimony by independent, credible and unimpeached witnesses. I believe that respondent is entitled to an adjudication predicated on the rules by which truth is universally tested and to be tried and convicted on the charges as preferred.